lourdes**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 16-cv-62802-BLOOM/Valle**

GUY PEPIN, *et al.*,

    Plaintiffs,

v.

POMPANO PLACE CONDOMINIUM
ASSOCIATION, INC., *et al.*,

    Defendants.
_____/

## ORDER ON SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendants Pompano Place Condominium Association, Inc., Normand Poirier, and Linda Pigeon's ("Defendants") Motion for Summary Judgment, ECF No. [50] (the "Motion"). The Court has carefully considered the Motion, all supporting and opposing filings, the relevant authorities, and is otherwise duly advised. For the reasons that follow, Defendants' Motion is denied.

### I. BACKGROUND

#### A. Plaintiffs' Claims in the Amended Complaint

Plaintiffs, Guy Pepin, Annie Pepin, Lars Andersson, Leilia Andersson, and Jarl Hansson ("Plaintiffs") have sued Defendants for violations of the Fair Housing Act ("FHA"), specifically for a denial of housing under 42 U.S.C. § 3604. *See* ECF No. [10]. Guy Pepin ("Mr. Pepin"), as the owner of Unit 201 in Pompano Place Condominium ("Pompano Place"), and Annie Pepin ("Ms. Pepin"), as the owner of Unit 101, allege that their buyers, Lars Andersson ("Mr. Andersson") and Leilia Andersson ("Ms. Andersson") and Hyndi Khomutetsky, were denied housing and were discriminated against in violation of the FHA because they are not French

Canadian. *Id.* Count I alleges a claim by Mr. Pepin against Defendants for their denial of a dwelling to a non-French Canadian buyer, which deprived him of the ability to sell Unit 201. *Id.* at ¶¶ 30-34. On behalf of Ms. Pepin, Count II alleges the same claim as to her inability to sell Unit 101 to a non-French Canadian buyer. *Id.* at ¶¶ 35-39. Counts III and IV assert claims on behalf of Mr. Andersson and Ms. Andersson respectively for Defendants' alleged denial of a dwelling to them on the basis that they are not French Canadian. *Id.* at ¶¶ 40-49. Within Count V, Jarl Hansson ("Mr. Hansson"), in his capacity as the Andersson's real estate agent, alleges that his clients were denied housing because of their language or nationality. *Id.* at ¶¶ 50-54. Defendants filed a Motion for Summary Judgment on all claims asserted in the Amended Complaint. *See* ECF Nos. [49] and [50]. Plaintiffs' timely Response and Defendants' timely Reply followed. *See* ECF Nos. [52], [51], [52] and [55]. The Motion is now ripe for review.

### B. Undisputed Facts

#### 1. The Condominium Association

Pompano Place is a twenty-four unit condominium property located at 221 S.E. 9th Avenue in Pompano Beach, Florida. *See* ECF No. [49] at ¶ 1.[1] Defendant Pompano Place Condominium Association, Inc. (the "Association") administers and governs the property known as Pompano Place. *Id.* at ¶ 2. Defendant Normand Poirier ("Mr. Poirier") served as the president of the Association and as a board member since October of 2015 while Defendant Linda Pigeon ("Ms. Pigeon") served as the secretary-treasurer and also as a board member since May of 2015. *Id.* at ¶¶ 3-4. Non-party Steve Lambert was the vice president of the Association and served as a board member since May of 2015. *Id.* at ¶ 5. Mr. Pepin served as the Association's vice president from 1994 to 1995 and as the Association's president and board

---

[1] The Court's citation to Defendants' Statement of Material Facts, ECF No. [49], in the Undisputed Facts section reflects those facts that Plaintiffs do not dispute and that the record also supports.

member from May 23, 2015 to October 2, 2015. *Id.* at ¶¶ 6-7. Each member of the Association's board of directors has equal voting power. *Id.* at ¶ 8.

Article 1.1 of the Declaration of Condominium ("Declaration") provides: "No Condominium Unit Owner may dispose of a Unit or any interest therein by sale without approval of the Association." *Id.* at ¶ 9. The purpose of this prior approval requirement is "[t]o maintain a community of congenial residents who are financially responsible and thus protect the value of the Condominium Units, and to insure the financial ability of each Unit Owner to pay assessments made against [them]." *Id.* at ¶ 10. The Declaration further requires that any "unit owner intending to make a bona fide sale of his condominium unit or any interest in it shall give the Association notice of his intention, together with an executed copy of the proposed contract with the name and address of the intended purchaser, the price, terms and conditions, if any." *Id.* at ¶ 11. Within fifteen days of receiving such a notice and the required information, the Association must either approve or disapprove the proposed transaction. *Id.* at ¶ 12. If the Association fails to comply with this timeline, the application "shall be deemed to have been granted." *Id.* at ¶ 13.

On May 21, 2016, the Association held an annual meeting with its members during which a new sale approval process was adopted. *Id.* at ¶ 14. This new process required a credit and criminal background check of prospective buyers. *Id.* at ¶ 15. Prior to the adoption of this new approval process, the Association relied upon a word-of-mouth system based upon the board members' personal knowledge of the potential buyer. *Id.* at ¶ 16. The long-standing word-of-mouth policy resulted in a community of all French-speaking unit owners, except for one owner who took over the unit after his parents, Donat and Françoise Dumont, passed away. ECF No.

[52] at ¶ 17.[2] This system, however, was not working well because the Canadian dollar began declining in value in 2015 with an almost 40 percent difference in the exchange rate and because the Association was concerned it would be "under water" if one or two members did not pay their dues. *See* ECF No. [52] at ¶ 16; ECF No. [49] at ¶ 17.

### 2. The Alleged Discrimination

Ms. Pepin is the owner of Pompano Place Unit 101 ("Unit 101") while Mr. Pepin is the owner of Pompano Place Unit 201 ("201"). *See* ECF No. [49] at ¶¶ 23-24. On August 14, 2016, Mr. Pepin entered into a contract for the sale and purchase of Unit 201 with buyer Hyndi Khomutetsky. *See* ECF No. [49] at ¶ 25. Ms. Khomutetsky lives in the United States, is not French Canadian and does not speak French Canadian fluently. *See* ECF No. [52] at ¶ 25. On the following day, Ms. Pepin entered into a contract for the sale and purchase of Unit 101 with Mr. and Ms. Andersson, who are Swedish, and were represented by Mr. Hansson, a real estate agent. *See* ECF No. [49] at ¶ 26; ECF No. [52] at ¶ 26. The proposed sale of Units 101 and 201 were submitted to the Association for its approval, including authorization for a credit and criminal background check of the interested buyers. *See* ECF No. [49] at ¶ 27. Prior to the proposed sale of these two units, the Association had not required that other buyers submit to these background checks as these procedures were recently adopted in May of 2016. *Id.* at ¶ 28. The Association employed Scott-Roberts and Associates LLC ("Scott-Roberts") to perform the background checks on the potential buyers, but on September 12, 2016, Scott Roberts declined to provide the requested information because the Association did not maintain a "standalone office." *Id.* at ¶¶ 29-30. On September 13, 2016, the Association informed Ms. Pepin that her

---

[2] To the extent the Order cites to Plaintiffs' Statement of Material Facts in the Undisputed Facts section, such facts are supported by the record evidence and Defendants did not contradict those statements with any evidence in their Reply.

request to approve the sale of Unit 101 was denied and informed Mr. Pepin that his request to approve the sale of Unit 201 was also denied. *Id.* at ¶¶ 35-36. By a vote of 2-1, the Association's board of directors declined the requested approval. *Id.* at ¶ 33.[3] Mr. Poirier was the only board member who voted to approve the sales. *Id.* at ¶ 34. After the Association was unable to obtain credit and background information on potential buyers from an independent source, it abandoned this procedure because it would result in the refusal of other future sales. *Id.* at ¶ 37. The Association sent Mr. Pepin a letter advising him that all future sales would be approved. *See* ECF No. [52] at ¶ 37.[4] In an October 17, 2016 letter, the Association informed Mr. Pepin of its willingness to approve a buyer for Units 101 and 201 following a favorable interview and explained that the prior refusal was the result of its inability to obtain a timely credit and background check. *See* ECF No. [49] at ¶ 38. This letter was sent one week after Plaintiffs' counsel notified Pompano Place's counsel that Plaintiffs were pursuing a claim for FHA discrimination. *See* ECF No. [52] at ¶ 38.

Thereafter, on October 27, 2016, Mr. Pepin entered into a sale and purchase agreement with Mr. and Ms. Andersson for Unit 201. *See* ECF No. [49] at ¶ 39. On November 4, 2016, Mr. Poirier sent an email to Mr. Andersson as follows:

> If Pompano Place accept your buy and approved you in our Association I ask you to remove all legal case against Pompano Place. It's a minimum. If you don't

---

[3] Although Plaintiffs dispute this assertion in their Statement of Facts, they do not provide the Court with any contradictory evidence. Plaintiffs cite to a different letter dated October 17, 2016 and argue that this subsequent letter makes no mention of a 2-1 vote. *See* ECF No. [52] at ¶ 33. This does not contradict the fact that the Association's decision to refuse to approve the sale on September 13, 2016 was the result of a 2-1 vote. In addition, Plaintiffs direct the Court to Exhibit 8 of Mr. Poirier's deposition for this evidence; however, the record only contains Exhibits 1 through 4 to the deposition. *See* ECF No. [41]. Thus, the evidence upon which Plaintiffs rely to create an issue of fact on this subject is not part of the summary judgment record.

[4] Plaintiffs also state that the "Board clearly considered the impact of potential litigation for housing discrimination, since they copied correspondence to counsel for the Plaintiffs." *See* ECF No. [52] at ¶ 37. However, the testimony Plaintiffs cite within Mr. Poirier's deposition does not support this statement and the letter that Plaintiff references was not filed with the deposition transcript. *See* ECF No. [41].

> remove the legal case, all other owners of Pompano Place will don't like you, and after the buying of your condo you will pay your part of the amount.

*Id.* at ¶ 39. On November 8, 2016, the Association approved Mr. and Ms. Andersson's proposed purchase of Unit 201. *See* ECF No. [49] at ¶ 40. But, with this history, Mr. and Ms. Andersson subjectively believed that they had been the object of discrimination and did not go forward with the purchase of Unit 201. *Id.*

Also relevant to the question of discrimination at Pompano Place is the undisputed testimony of Mr. Pepin regarding a separate incident that occurred in 2015. Mr. Pepin witnessed an incident during which Mr. Poirier along with condominium owners Bertrand de Mence, Deline Caron, and Lucille Jolicouer approached Lucie Lavoie in Pompano Place and told her that any person not of Canadian nationality was not welcome and that they only wanted French Canadians within the complex.[5] *See* ECF No. [48] at 63-66.

### C. Disputed Facts

A significant part of the dispute here involves a document entitled "Lettre D'Engagement Des Proprietaires,"[6] which states:

---

[5] Although paragraph 41 of Plaintiffs' Statement of Material Facts purports to attach the Declaration of a realtor by the name of Julie Lavoie and relies upon that Declaration for certain facts, the Declaration was not made part of the summary judgment record. Plaintiffs identify it as Exhibit 9 to their Statement of Material Facts, but Exhibit 9 is an email from Mr. Poirier. The Court has otherwise reviewed Plaintiffs' submission of summary judgment evidence and was not able to locate any Declaration from Ms. Lavoie. In either event, Plaintiffs also directed the Court to Mr. Pepin's testimony wherein he recounted this incident.

[6] The parties have not provided the Court with certified translations of various documents in French. Instead, the parties have informally translated portions of certain documents in their submissions. Significantly, neither party disputes the accuracy of these translations and both parties rely upon them. In light of the parties' use of these translations without objection, the Court will consider them for purposes of summary judgment only. However, the parties are reminded that, for purposes of trial, they "shall exchange exhibit translations and attempt to resolve any issues regarding the translations" by December 11, 2017. *See* ECF No. [54] at 4. The parties will not be allowed to present non-certified translations of documents at trial. Likewise, the parties are reminded that they must "confer and agree on a single translator service for the trial" and such a service "must be federal court certified." *Id.*

> We, the undersigned, in our quality of owners of units of condominiums . . . would like to protect our interests and adhere fully to the principle and to the will of our Association of maintaining a community of owners at Pompano Place having a homogenous culture in order to preserve harmony within our group. In this spirit, *we commit to restrain the sale of our units to persons of the same culture as ours, that is French Speakers, Francophones*.

*See* ECF No. [49] at ¶ 18 (emphasis added) (the "Letter").[7] Defendants contend that no Association meeting minutes make any mention of the Letter. *See* ECF No. [49] at ¶ 19. However, Mr. Pepin's Declaration attests to the fact that the Association's meeting minutes make reference to its historical desire to maintain French Canadian ownership as well as to the Letter itself.[8] *See* ECF No. [53-1]. According to Mr. Pepin, the Association's meeting minutes dated May 25, 2002 make reference to a unit for sale and a request that the message be passed along to relatives and friends to conserve the Association's Canadian ownership. *Id.* at ¶ 6. Similarly, in meeting minutes dated May 24, 2003, consultation with an American jurist was proposed to determine the means available to keep only French Canadian owners in the Association. *Id.* at ¶ 7. In the same minutes, there is a reference to the drafting of an internal

---

[7] In a footnote, Defendants object to the admissibility of Exhibit 8 to Mr. Pepin's deposition "during any trial of these proceedings, pursuant to Rules 401 and 403 of the Federal Rules of Civil Procedure." ECF No. [49] at 5, n.1. Defendants, however, do not object to the admissibility of the document for purposes of summary judgment and instead reference the document in their Motion for Summary Judgment and Statement of Material Facts. *See* ECF No. [49] at ¶ 18.

[8] Defendants' Reply to Plaintiffs' Statement of Material Facts responds to the additional facts in paragraph 19 as follows: "Plaintiffs' additional facts are disputed." *See* ECF No. [56] at ¶ 19. Defendants also respond in this fashion to Plaintiffs' additional facts in paragraphs 20, 21, 22, 31, 32, 33, 35, 36, 39, 40, and 41. *See* ECF No. [56]. With the exception of the Declaration of Mr. Poirier used to rebut Plaintiffs' assertion in paragraph 20, Defendants do not cite to any facts or evidence in the record to dispute any of Plaintiffs' additional facts. Local Rule 56.1(b) provides that all material facts filed and supported with record evidence "will be deemed admitted unless controverted by the opposing party's statement." *See State Farm Mut. Auto. Ins. Co. v. B & A Diagnostic, Inc.*, 145 F. Supp. 3d 1154, 1158–59 (S.D. Fla. 2015) (finding that the defendants conclusory and self-serving declarations in response to the plaintiff's statement of facts lacked any probative value and were insufficient as a matter of law); *Levin v. Nationwide Home Loans, Inc.*, No. 13-60306-CIV, 2014 WL 11531634, at *1 (S.D. Fla. Mar. 14, 2014) ("Here, Plaintiffs' Response to the Motion for Summary Judgment does not comply with Local Rule 56.1 *because it is not supported by any evidence and it does* not include a statement of material facts in controversy consisting of separately numbered paragraphs.") (emphasis added). Defendants' bare assertions that Plaintiffs' additional facts are disputed are insufficient.

understanding to be signed by all owners to commit to selling only to French Canadians. *Id.* During the May 22, 2004 meeting, the Association's minutes reflect that after the 2003 meeting, it was decided that a commitment letter would be prepared for the owners' signatures agreeing to maintain a homogenous culture and that the letters would be maintained in the Association's files. *Id.* at ¶ 8. On December 19, 2007, the minutes note that all new owners must sign a moral document to the effect that, upon resale of their unit, they will only sell to individuals from Quebec. *Id.* at ¶ 10. In addition, Mr. Pepin attests that on May 30, 2010, Mr. Poirier asked him to sign the Letter, but Mr. Pepin refused to do so. *Id.* at ¶ 12. In addition, the Letter was distributed to condominium owners on May 29, 2009, June 30, 2009 and May 24, 2013. *Id.* at ¶ 13. Mr. Pepin's Declaration further states that the June 30, 2009 Letter appears to be signed by Mr. Poirier and attaches a signed copy of it. *Id.* at ¶ 13; P. 19. During his deposition, Mr. Poirier testified that he believes he purchased his unit in July of 2009, which is in close temporal proximity to the date he purportedly signed the Letter. *See* ECF No. [41] at 22. In Reply to Plaintiffs' Statement of Facts, Mr. Poirier submitted a competing Declaration in which he acknowledged that the June 30, 2009 Letter appears to contain his signature, but he denied ever executing the Letter or authorizing anyone to place his signature on the document. *See* ECF No. [56-1].

Defendants also point out in their Statement of Facts that, to Mr. Pepin's knowledge, no unit owner signed the Letter during his tenure as an Association officer or director from May 23, 2015 to October 2, 2015. *Id.* at ¶ 21. Similarly, during his tenure, no documents intending to limit sales to French Canadians were distributed. *Id.* According to Plaintiffs, this is because Mr. Pepin opposed the policy contained in the Letter, would not have required or requested any

owner to sign such a document during his tenure, and "would have fought until the end to avoid such an act of discrimination to take place." *See* ECF No. [52] at ¶ 21.

The parties also dispute certain facts surrounding the background checks performed on the potential buyers for Units 101 and 201. Defendants state that they attempted to employ three other companies in addition to Scott-Roberts to provide the requested credit and background information, but all of them refused because the Association did not have a stable office. *See* ECF No. [49] at ¶ 31. Plaintiffs, however, submit evidence that Mr. Poirier did not attempt to employ any other companies to perform the background checks until October 27, 2016 – six weeks after the Association rejected the buyers and two weeks after Plaintiffs' counsel put Defendants on notice of their intent to pursue a claim for an FHA violation. *See* ECF No. [52] at ¶ 31.

The parties also dispute the reason behind the Association's September 13, 2016 rejection letters. Defendants state the rejection letters were sent because the Association's Declaration requires automatic acceptance of a prospective buyer if the request is not denied within fourteen days and, in this instance, the Association was unable to obtain the background checks within this timeframe. *See* ECF No. [49] at ¶ 32. They further explain that the rejections were made pending the receipt of the potential buyers' criminal background and credit checks. *Id.* In response, Plaintiffs supply the September 13, 2016 rejection letters, which state "we made our verification and consultation and we have the regret to inform you that the Pompano Place Condominium Association, Inc. has decided to refuse the offer for" Units 101 and 201. *See* ECF No. [53-7] at 3-4. As Plaintiffs point out, the rejection letters suggest that the verification process was completed and do not indicate that the rejection was temporary until the criminal background and credit check could be performed. *Id.*

## II. LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The court views the facts in the light most favorable to the non moving party and draws all reasonable inferences in the party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs.*, L.L.C., 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each

essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. But even where an opposing party neglects to submit any alleged material facts in controversy, a court cannot grant summary judgment unless it is satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed. *See Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

## III. DISCUSSION

Defendants seek summary judgment on Plaintiffs' discrimination claims under the FHA, which makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of . . . national origin" and "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of . . . national origin." 42 U.S.C. § 3604(a)-(b). To prevail on this claim, a plaintiff must show "unequal treatment on the basis of [national origin] that affects the availability of housing." *Bonasera v. City of Norcross*, 342 F. App'x 581, 583 (11th Cir. 2009) (quoting *Jackson v. Okaloosa Cty. Fla.,* 21 F.3d 1531, 1542 (11th Cir.1994)). Such an FHA violation can be proven by demonstrating "(1) intentional discrimination, (2) discriminatory impact, or (3) a refusal to make a reasonable accommodation." *Id.*

In a lawsuit alleging intentional discrimination, "a plaintiff has the burden of showing that the defendants actually intended or were improperly motivated in their decision to discriminate against persons protected by the FHA." *Id.* (quoting *Reese v. Miami–Dade Cty.*, 242 F. Supp. 2d 1292, 1301 (S.D. Fla. 2002)). The Eleventh Circuit has allowed intentional discrimination to be proven through evidence that the "decision-making body acted for the sole purpose of effectuating the desires of private citizens, that [national origin] considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the motivations of the private citizens." *Id.* (quoting *Hallmark Dev., Inc. v. Fulton Cty., Ga.*, 466 F.3d 1276, 1284 (11th Cir. 2006)). On the other hand, in a lawsuit alleging discriminatory impact, a plaintiff can either demonstrate that "the decision has a segregative effect or that 'it makes housing options significantly more restrictive for members of a protected group than for persons outside that group.'" *Id.* at 585 (quoting *Hous. Investors, Inc. v. City of Clanton, Ala.*, 68 F. Supp. 2d 1287, 1298 (M.D. Ala. 1999)).

FHA discrimination claims use the burden-shifting analysis outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Steed v. EverHome Mortg. Co.*, 308 F. App'x 364, 368 (11th Cir. 2009) ("We use the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), to evaluate claims based on circumstantial evidence of discrimination under the FHA"). Under this framework, the plaintiff carries the initial burden of proving the *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. Once satisfied, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for the housing action. *Id.* at 802-

803. From there, the plaintiff must then demonstrate that the reason given was merely a pretext offered to cover up the discriminatory decision. *Id.* at 806.

In their Motion, Defendants only challenge the last *McDonnell Douglas* factor, meaning that Plaintiffs cannot prove Defendants' legitimate reason for refusing to approve the sales of Units 101 and 201 were mere pretext. *See* ECF No. [50] at 5-7. Therefore, the Court limits its analysis to this issue. Pretext can be proven "either directly by persuading the court that a discriminatory reason more likely motivated the [decision maker] or indirectly by showing that the [decision maker's] proffered explanation is unworthy of credence." *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308–09 (11th Cir. 2012) (quoting *Burdine,* 450 U.S. at 256). Stated differently, "the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the [decision maker] were not the real reasons for the [discrimination]." *Id.* at 1310 (quoting *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir. 1997)).

In support of their argument, Defendants explain that the Association declined to approve the sales under non-discriminatory circumstances. These consist of (1) the newly implemented policy of reviewing credit and criminal background investigations of prospective buyers, (2) Defendants' inability to obtain those investigations from three different sources, and (3) the need to reject the applicants before the deadline contained within the Association's Declaration, which would trigger an approval by default. *See* ECF No. [50] at 5. Defendants argue that no evidence of pretext exists because the most recent Association Letter was dated May of 2013 and all discriminatory policies were abandoned during Mr. Pepin's tenure as president in 2015. *Id.* at 6. According to Defendants, the three presiding board members in 2016, Mr. Lambert, Ms. Pigeon,

and Mr. Poirier became board members two years after the Letter was last signed and none of them ever signed it. *Id.*

In response, however, Plaintiffs present significant evidence creating an issue of fact as to whether the Association's stated reasons for rejecting the sales were simply pretext for a discriminatory motive. Plaintiffs contend that the Association did not approve the sales of Units 101 and 201 because none of the potential buyers spoke French Canadian and none of them were French Canadian. As a result, Plaintiffs were denied housing on the basis of their national origin in violation of the FHA. To support their claim, Plaintiffs direct the Court to the original rejection letter dated September 13, 2016, which made no mention of Defendants' inability to obtain the required background checks or that the rejection was provisional while the Association attempted to complete those checks. Of significance is that the letter informed Mr. and Ms. Pepin that the Association had "made [its] verification and consultation" and it "decided to refuse the offer" for Units 101 and 201. Plaintiffs have also produced evidence that the Association did not make any subsequent efforts to pursue background checks through other third parties until October 27, 2016 – six weeks after the Association rejected the sale and two weeks after Plaintiffs' counsel put Defendants on notice of their intent to pursue a claim for discrimination.

In addition, Plaintiffs direct the Court to the Association's historical meeting minutes and the Letter as evidence that the Association intended to only sell condominium units to French Canadians in an effort to preserve a homogenous culture. Although Defendants argue there is no evidence the Letter was signed after May of 2013 and that any such discriminatory practices came to a halt during Mr. Pepin's tenure as Association president, Plaintiffs produced evidence demonstrating the existence of discriminatory intent in 2015. This occurred when several

owners approached Ms. Lavoie and informed her that only French Canadians were welcome in the building. According to Mr. Pepin, Mr. Poirier – a board member and the president of the Association during the relevant time period – was among those owners who expressed this point of view. Moreover, Plaintiffs have presented evidence that Mr. Poirier signed the Letter, thereby committing to sell the units to French Canadians only. Although Mr. Poirier disputes signing it, his Declaration recognizes that "it appears that [his] signature is on the Letter." ECF No. [56-1]. The Court cannot determine on summary judgment whether Mr. Poirier indeed signed the Letter. This dispute creates a genuine issue of material fact for the jury. Further, there is no evidence in the record that the Association ever took any steps to denounce the Letter or the policy stated within the Letter. While Mr. Pepin may have been opposed to the policy in the Letter during his five-month tenure as Association president, this does not mean that subsequent board members adopted and implemented the same view during their respective tenures. Plaintiffs also point out that the Association's long-standing policy resulted in a building owned entirely by French Canadians, with the exception of one unit owner who took over the unit after his parents passed away. This creates an inference of discriminatory impact.

In its summary judgment analysis, the Court is mindful that it must view the facts in the light most favorable to Plaintiffs, as the non-moving party, and it must draw all reasonable inferences in Plaintiffs' favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). Based on this record, the Court does not reach the conclusion that no jury could reasonably find for Plaintiffs. The record contains sufficient evidence that raises an issue of fact as to whether the Defendants' September 13, 2016 rejection was based on a discriminatory or non-discriminatory motive.

## IV.     CONCLUSION

For all of the reasons stated herein, it is **ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment, **ECF No. [50]**, is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 1st day of December, 2017.

                **BETH BLOOM**
                **UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record